STATE, ARCHIBALD G. KING ET AL., PROSECUTORS, v. JOHN REED, OTTO KOHLER AND CHARLES PINNELL, ASSESSORS, AND THE TOWN CLERK OF THE TOWN OF UNION.

1. A supplement passed in 1874, (*Pamph. L.*, *p.* 732,) to an act to improve Bull's Ferry road in Hudson county, &c., provides for the construction of a sewer in said road.

2. It provides that certain commissioners should prepare an estimate of the cost of the sewer and a map of the lands which would economically drain into the sewer. This was done, and the map showed a drainage area in the town of Union and the townships of West Hoboken and Weehawken. Commissioners were, by the act, subsequently to be appointed to ascertain the entire cost of the improvement and divide it among the three towns, and then to assess the portion assigned to each town upon the lots lying within the drainage area of the town. This was done.

3. *Held*, that the fact that one of the assessors not resident in either of the towns held a mortgage upon land lying in the town of Union did not disqualify him as one not a non-resident and holding property in either of the townships to be assessed.

4. The lots assessed are divided into two classes, those fronting upon the sewer and those separated from the sewer by intervening property held by other persons; as to the latter class of lots, a natural stream of water runs near some and traverses others, and after running through lands of other persons, enters the sewer and by it passes into the river. *Held* that these lots are not so connected with the sewer as to receive any assessable benefit from it.

5. *Held* that the assessment to the towns was not necessarily to be limited

King v. Reed.

to the amount of actual benefits received by the assessable land therein, but the entire amount of the cost of the sewer was to be divided between the towns in proportion to such benefits and not in proportion to the extent of the drainage area.

6. *Held*, that an assessment upon an entire tract as a single lot may be good, although an assessment of the same amount upon all the tract in parcels may, as to some of the assessments, be bad.

7. *Held*, that the provision in the act for the assessment of the entire expense of the sewer upon the three towns in proportion to the benefit received by the land in each town, is not void as an attempt to delegate legislative power.

8. The act provides that each township shall issue bonds previous to the completion of the work, to furnish money during its progress, and that if after its completion and the assessment of the expense to the towns it appears that any township had issued bonds in excess of its proportion, the excess should be distributed to the other towns. *Held*, this was not a provision designed to fix upon one municipality the debt of another.

Eight writs were allowed upon the application of a number of prosecutors to bring up an assessment for the construction of a sewer in Hudson county. Upon motion it was ordered that these writs should be consolidated and a single return made to all.

The proceedings under review are taken in pursuance of certain legislation which had its commencement in 1872, in " An act to improve Bull's Ferry road, in Hudson county, from the northerly line of the township of Weehawken to the Hackensack plank road, and also the branch road leading from Bull's Ferry road opposite Weehawken street, in the town of Union, to Nineteenth, street in the township of Weehawken."

By this act, John H. Bonn, Henry J. Rottman and Abram Y. Duryea were appointed commissioners to improve and widen the road.

In 1874, (*Pamph. L., p.* 732,) a supplement to this act was passed, providing for the construction of a sewer in the Bull's Ferry and branch roads. The scheme provided was, in substance, as follows:

The original commissioners were empowered to propose

plans, maps, and estimates, showing the position, size, extent and probable cost of said main sewer or sewers, including the cost of such parcels of land outside of said roads as might be necessary to secure a proper outlet for said sewers.

The commissioners were also to show the location and extent of the lands from which, with proper connections, water and other drainage matter will economically drain into said sewers, which lands were to be considered the drainage area in the proceedings for assessment.

The commissioners were to lay this plan, map and estimate before a joint meeting of the town council and the committees of the townships within which the drainage area might lie.

If those several bodies agreed to the said maps, plans and estimates, or a modification thereof, and also the owners of a majority of the land in that part of the drainage area included in each of the said town or townships, then the commissioners were to proceed with the work.

To enable the said owners of land to form an intelligent opinion upon the question whether they should agree or dissent, the said maps, plans and estimates were to be filed in the city clerk's office of the town of Union within ten days after the assent of town council and the township committees, and two weeks' notice was to be given, and a period of thirty days after the termination of such notice was accorded to the said land-owners to file their dissent.

This part of the scheme was duly executed by the commissioners. They made a map with an estimate of expenses and filed it in the clerk's office of the town of Union.

It included within the drainage area lands within the township of West Hoboken, the township of Weehawken and the town of Union. The plans and estimate were submitted to a joint meeting of the town council and the committees of the respective townships.

They assented to the plans. The plans were filed, and a majority of the land-owners in neither of the townships or the town filed their dissent within the thirty days after notice. The said town council and the said township committees also

King v. Reed.

agreed to advance all moneys necessary for said work, as required by section 5 of the act of 1874, before the said work could be done.

The scheme provided for the payment for the sewers was as follows:

The commissioners were to issue improvement certificates, which were to be redeemed by bonds or paid.

When the sewers were completed, then, on application of the commissioners, the Supreme Court was to appoint three persons, non-resident, and holding no property in either of the townships, to be assessors. They were to ascertain the expense of executing the work, and then ascertain how much of the sum is the benefit received by the property in each town and township in the drainage area, in order that each town and township may know the amount of this benefit in order that bonds may be issued therefor.

The town and townships respectively were empowered to issue bonds to the amount of the sum so assessed on each, and the proceeds of these bonds were to be used in redeeming the improvement certificates issued by the commissioners.

The assessors, after making the assessment as to the land in each town and township generally, were to proceed further.

They were then to make an assessment on each separate lot or parcel lying within the drainage area, according to the benefits actually received by said lot or parcel. They were to make a map of this assessment, delineating each lot, with the owners' names thereon, and file it in the clerk's office of the town or township within which the land lay. Notice was to be given for the filing of objections, after which the assessors were to correct, if necessary, and finally adopt the map.

All this was done in the present case. The amount of bonds issued, however, was not limited to the amount of the assessment to each town or township.

A supplement was again passed in 1875, (*Pamph. L., p.* 302,) which provides for the issue of bonds previous to the assessment, fixing the maximum amount of such issue at $15,-

000 for West Hoboken, $45,000 for the town of Union, and $30,000 for the township of Weehawken.

In case any one of these should issue bonds in excess of its subsequent assessment it shall be reimbursed by the other town or townships, and the adjustment and ascertainment of such excess shall be made by the assessors.

The above statement displays the general features of the statute involved in the present contention. The remaining facts can be better stated in connection with the discussion of the legal questions arising thereupon.

Argued at June Term, 1880, before Justices Dixon, and Reed.

For the prosecutors, *J. B. Vredenburgh* and *I. W. Scudder*.

For the defendants, *Robert Gilchrist*.

The opinion of the court was delivered by.

Reed, J.  The first objection which I shall consider is the one alleging that Charles Pinnell, one of the assessors, is disqualified to act as such.

The disqualification is alleged to arise from the fact that he is the owner of a mortgage which is a lien upon lands situate in the town of Union and also in the township of West Hoboken.

The statute requirement is, that the assessors shall be persons non-resident and holding no property in either of the townships, and the report of the assessors states that those who made it possess the requisite statutory qualification.

Mr. Pinnell is admittedly not a resident in either town ; and when I hereafter speak of towns, I shall include township as well within the term.

It is urged that he is the owner of property within the towns because it appears that he holds a mortgage upon lands lying therein.  But a mortgage is a personal chattel and has no *situs* but the domicil of the owner.  The face that the

land upon which it is an encumbrance happens to lie in the prescribed territory does not bring Pinnell within the disqualifying clause of the statute.    Nor do I see that Pinnell is so interested in land which may be affected by this assessment, as to disqualify him under the rule that a man cannot be a judge in his own case.

If it be proven that Pinnell owns a mortgage upon land located within the drainage district in the town of Union, yet it does not appear, either from the act under consideration or the charter of the town of Union, that an assessment upon such lot could disturb the lien of his pre-existing mortgage.

And at the time this assessment was made the same was true of any general tax which might have been levied to pay any difference between the assessment to the town and the aggregate assessments to the lots within the drainage area within the town.

I think, therefore, that nothing existed at the time of making this assessment to disqualify Pinnell from acting in the capacity of assessor.

The important reasons are those directed against the validity of the assessment, as made.    The question of the legality of the assessments presents two features, arising from the circumstance that the statute contemplates a double assessment. The amount of the cost of the work is to be first divided among the three towns, and second, the part so assigned to each town is to be assessed upon the land lying within the drainage district in the town up to the amount for which such lands are actually benefited.

The assessment to the township of Weehawken is attacked by the authorities representing that corporation, and by taxpayers residing within its limits.

The assessment which distributed this sum among the lots is attacked by the lot-owners, who also attack the township assessment as being too large a sum to be imposed upon all the lots within the drainage area in the township.

For a reason which will appear later, I will assume now that the assessment upon the township at large was correct,

and consider the assessment upon the lots owned by the prosecutors. The lots upon which assessments are made are divisible into two classes. The first class includes the tracts which adjoin the improvement, and the second class, those tracts lying at a distance from the improvement, with the property of others intervening.

Included within the first class are the lots of Mrs. I. C. B. Davis, Mrs. Richards, two lots of Mrs. C. Duer, and a lot of Edw. King ; and within the second class are the lots of Mrs. McLane, Mrs. James G. King, Mrs. J. B. King, Jr., and A. Gracie King.

In regard to the assessment upon the lots included within the latter class, I am unable to discover any ground upon which they can be supported. As already mentioned in their classification, none of them have any connection with the sewer, and between each of such lots and the sewer, lie tracts of land over which the owners of the lots have no control.

To the owners of these lots no benefit can accrue from this sewer as a conduit for sewerage until the construction of laterals. *State, Kellogg, pros.,* v. *Elizabeth,* 11 *Vroom* 274.

It is true, that because these lots are so disconnected from the sewer it does not necessarily follow that a benefit may not arise from the flowage of surface water therefrom.

In this case I can perceive no benefit accruing to these lots on this account. The assessors found that these lots were benefited under the idea that there exists a connection between them and the sewer by means of a natural stream of water which traversed some and ran near other of the lots. This stream, after running a long distance through and near these lots, passes through the lands of the Hoboken Land and Improvement Company, and empties or passes into the sewer about two hundred feet from its mouth, and so, by the sewer, passes into the Hudson river.

Now, the surface water naturally flows from these lots into this stream, and as a part of the stream uses the sewer for a short distance before reaching the river. But it is apparent that the sewer has in no way improved the stream as a pass-

age-way for water. All this water flowed to the same destination, with equal safety and advantage to property, before, as since its enclosure in the sewer.

Nor as a means of carrying sewerage, could it connect the land with the sewer so as to legally benefit the land.

If the stream could be legally used for such a purpose I do not see that the sewer improves its efficiency for that purpose. But there is no legal right to foul the water of this stream by such a use, and the Hoboken Land and Improvement Company, or any annoyed riparian owner, could enjoin such use at will.

The stream can in no sense be viewed as a means of connecting the lots and sewer so as to cause a benefit to the lots arising from the construction of the latter. I am unable to discover any source of benefit at all to these lots, and if there existed some such, yet the fact that the benefits were partly, if not entirely imposed on account of the utility of the sewer for drainage purposes is sufficient to vacate the assessments upon these lots.

The assessments upon the other class of lots are not invalid by reason of a want of facility for connecting with the sewer.

Are the several assessments too high? This question presents two points.

*First.* Are any of the other lots assessed too low, and would a proper assessment upon them diminish the amount to be raised upon other lots, so as to reduce the assessment upon the prosecutors' lots if the entire sum was properly distributed?

*Secondly.* Are any of the lots assessed more than the value of their actual benefits?

The evidence taken upon the second and incidentally upon the first point, is too voluminous to recite in detail.

It consisted mostly in topographical descriptions of the land, of the relative elevation of it and the sewer, of the character of the land as sites for residences, of laying off the lots in belts of land, the first fronting on the sewer and the others retreating successively for the purposes of assessment, and also consists of evidence of the mode of constructing and the cost

of the sewer.  I shall only say that after a consideration of the testimony of Mr. Payne and Mr. Brush, the engineers, and the parts of the remaining testimony that are material, I do not think that the report of the assessors is overcome by the proof.

No legal obstacle appears in the way of making the assessments upon these lots.  The amount of benefits was a matter of judgment.  Only clear proof will justify us in concluding that those fixed were erroneous.  *State, Hunt, pros.,* v. *Rahway,* 10 *Vroom* 646.

Upon both points involved in this question the answer must be in the negative.

The lots are not assessed too high, nor are the assessments improperly distributed.

The next question is, whether the assessment upon the township is properly laid.

The decision of this question not only affects the inhabitants of that township but these lot-owners also.  Because, if it appears that the entire amount assessed is too large, there must be a re-adjustment and modification of the amount assessed upon the lots, inasmuch as it appears that the entire amount of the township assessment has been imposed upon the lots.

It is contended that the assessments made by the assessors upon the three towns are not properly proportioned.  It appears that at the joint meeting of the town committees there was an estimate made by the engineer who was present, of the proportion of the expense which each town would incur.  This estimate was made at the suggestion of some one present, member of a committee.

The statute requires an estimate of the cost of the work and the location and extent of the drainage district to be laid before the meeting.

All this appeared upon the map, and in addition thereto appeared the division of the cost between the towns, the division being made upon the basis of the amount of drainage area in the respective localities.  It is now contended that the proportions of the several amounts assessed should be the

same as the proportions existing in the engineer's division of the estimated cost.

To illustrate the ground of the contention by figures, it appears that the estimated cost was $68,125.

This was divided by the commissioners as follows: to the town of Union, $34,053.22; to the township of West Hoboken, $18,511.08; to the township of Weehawken, $15,560.71.

The entire expense assessed is $71,482.60. This is divided by the assessors as follows: to the town of Union, $30,-106.08; to the township of Weehawken, $28,323.85; to the township of West Hoboken, $13,715.59.

It is thus apparent that while the proportion of the estimate for Weehawken township is less than one-fifth, the proportion of the cost assessed upon the township is more than one-third.

I am unable to see how the above contention of the prosecutors can be sustained. As it has already been stated, the estimate was divided merely by considering the extent of the drainable area in each town and township.

It was divided as a mathematical computation by the engineer, to show what the relative amounts would be according to the relative area.

But the statute clearly provides another method of adjusting the relative amounts to be assessed. The standard controlling the assessment is not area, but benefits.

Now, it is true that the production of a statement of the cost of this work, with a map showing the extent of the drainage area and its location, will fail to afford definite information as to the amount of such costs which will be assessed upon any particular part of such drainage area according to benefits. But this is nevertheless the plan which the statute provides for this purpose.

It was as apparent at the time the township committees gave their assent to the improvement as now.

There is no way by which the assessments can be made but upon the principle of benefits. If the assessment has been properly made in accordance with this rule, it is in accordance

with the statute, regardless of the relative quantity of land in the different towns.

Is the assessment to Weehawken sustainable as an assessment for the proportion of the benefit received by the property within the drainage district in said township?

As it already appears that certain parts of this land are incorrectly assessed, and inasmuch as the same sum is assessed by the assessors, first upon the land in bulk and then upon it in parcels, it would seem, at a first glance, that the assessment in bulk to the township must be incorrect; that if the assessments upon any of the lots are vacated, then it must follow that the assessment upon the whole tract must be vacated or modified.

But it is clear, upon consideration, that there is a marked difference between an assessment made upon an entire tract of land and a number of assessments upon the same tract assessed in parcels.

The aggregate amount of the several assessments may correspond with the amount of the single assessment, and yet, the latter be correct, and some of the former be excessive.

The totality of the assessments may be a fair estimate of the value of the benefit to the entire tract, and yet it may be injudiciously distributed.

In dealing with the several assessments the court is obliged to reduce excessive, but has no power to increase insufficient valuations. So it may follow that while reductions are made in these assessments, the value of the benefit to the entire tract may be represented by the sum of the lot assessments as originally made.

Again, it is clear from a reading of the seventh section of the statute, that the amount "assessed against the township" (in the language of the eighth section) is not limited to the value of the actual benefit received by the lands therein.

The whole amount of the expense, irrespective of present actual benefits to the land in the several townships, was to be broken up among the three towns.

Therefore, while it happens in the present case that the

assessor found that the lots were benefited up to the amount assessed against the township, yet a reduction of the former assessments because of the absence of an actual benefit, does not necessarily involve a reduction of the township assessment which is not limited to actual benefits. It is true that the amount of benefits controls the imposition of both assessments. In one it fixes the limit of the levy, and in the other the standard of its apportionment among the towns. But as the vacation of one or more of the lot assessments does not prove that the value of the entire tract is over-valued, so it cannot demonstrate that the proportions are incorrectly struck by the assessor, inasmuch as the proportions depend upon the relative benefit to the entire lands in each town.

Besides, it must be remembered that on dealing with proportion, we must consider not one, but each several subject of comparison to evolve the proper comparative relation.

Not the land in Weehawken alone, but the land in Union and West Hoboken as well, must be the subject of consideration in making an adjustment of proportions, and equally so in reviewing such an adjustment.

The adoption of a rule that leads to an over-valuation of the lands of one, may lead to a commensurate over-valuation in each of the other towns, and so the proportions may still be maintained.

Thus it follows that proof of the over-valuation of the benefits to one tract would furnish a strong, but not conclusive argument against the accuracy of the proportion of benefits between this and the other tracts.

I have said that an assessment of benefits to a tract of land as an entirety, and to it in parcels, may lead to the vacation of some of the latter and yet not affect the former.

This was said upon the supposition that some of the remaining parcels may have been under-valued. There is, however, another view which leads to the same result, and that is, that a tract of land held by one title may legally receive more benefit than the same tract held by different titles.

If a tract of land is so situated that connection with a sewer

can be economically made without passing over the land of another, there is no legal rule that forbids an assessment for the benefit that shall accrue to the whole of it; but if it is cut up into lots, with various owners, and only one of the lots lies so as to be drainable without crossing the land of others, that lot alone is actually benefited.

It seems to me that the assessors, in making their assessments to the towns, should not take the aggregate of actual benefits to lots, but the benefits to the land considered as an entire tract.   If the first method is adopted the following would be the probable result:  one town would have a belt of land lying upon the constructed sewer, and a smaller territory lying apart from it.

The first tract can be assessed.   Another town has a small lot fronting and large territory lying not·adjoining, but a short distance therefrom ; the latter lot is not assessable.

Taking actual benefits as the rule, a large debt would be imposed upon one, and a small debt upon the other town.

The latter town, by building a lateral sewer at a small expense, could connect all the land, assess it for the entire work, and repay itself entirely.

The other town having no such land unassessed is compelled to pay its debt by general taxation.   Treating the property in each township as an entire subject matter for assessment, this manifestly unjust result could not follow.   I see no difficulty in the way of so treating it.

The township, as a political subdivision of the state, would have no difficulty in securing and exercising the right to make the connection, the want of which, and the want of certainty of ever having which, is the ground of the rule that no benefit accrues to the private owner of disconnected lots.

This is what I think the assessors have done.   While the fact that they took no notice of the want of connection with the sewer of certain lots, invalidates the lot assessments, yet I do not think the method of ascertaining the proportion of benefits was illegal.   Neither do I think it is shown that the

King v. Reed.

assessors erred in judgment in the actual determination of the amount of relative benefits.

From a careful consideration of the testimony, taking the slope of the lands to and from the line of the sewer, the relative amount of frontage upon the sewer, the character of the land, with its capacity for improvement, as well as its improved condition, I do not think that the report of the assessors has been overcome.

Another reason is directed against the act of the assessors in adjusting the amount of assessments against the towns and in fixing the amount of bonds issued by one town in excess of its proportion of expense upon the other towns, by direction of the supplement of 1875. As we have stated in the preliminary recital of the provisions of the statutes authorizing this work, the original act provides for an assessment of the entire expense of the work upon the three towns after the ascertainment of the expense, and then provides for the issuing of bonds by each town up to the amount of its portion of the general burden.

The supplement of 1875 provides for the issuing of bonds previous to the completion of the work, arbitrarily fixing the maximum amount of bonds to be issued by each town. After the completion of the work and consequently after the assessment to the towns of their proportions of the expense, it provides that if any town had issued bonds in excess of the subsequently ascertained portion of the expense which it should pay, then such excess should be distributed to the other towns in accordance with the ascertained proportions of benefits.

This the assessors did, and they reported that Weehawken township had issued bonds in excess of its proportion, and the other towns had issued bonds to an amount less than their respective proportions, and adjusted the amount in accordance with such finding.

All this action by the commissioners is attacked on the ground that the statute which authorized it, is void, as an attempt to delegate legislative power.

It is contended that the statute confers upon the assessors

the power to fix debts upon these towns, and therefore conflicts with the rule enunciated in the case of *State, Gaines, pros.,* v. *Hudson Avenue Comm'rs,* 8 *Vroom* 12. In that case it was held that a statute that left to the discretion of a board of commissioners, in what proportion the expense of laying out and opening a public avenue should be imposed upon the townships of a county, was beyond the legitimate exercise of legislation.

It was held that a statute of this kind must itself distribute the burden or prescribe a standard by which such distribution is to be made.

The present act differs from that then under consideration, in the one material feature, that this act does provide a standard, and that standard is an equitable one, being the proportionate benefits received by the property in each town.

As held in the case just mentioned, the legislature must designate the rule of taxation, but the method of executing the law in accordance with the rule is administration and not legislation.

Says Judge Cooley: "If the rule is prescribed which in its administration works out the result, that is sufficient; but to refer the making of the rule to another authority would be in excess of legislative authority." *Cooley on Taxation* 50.

I think that the legislature, instead of fixing upon each of the townships affected by this work an arbitrary sum, acted wisely, as well as constitutionally, in fixing a standard of apportionment—the very best that could be devised. I also think that the other view is untenable, which would treat the adjustment of the excess of amount of bonds issued by a township, under the supplement of 1875, as the placing of the debt of one township upon another.

The issue of bonds under that supplement was to afford an efficient way to raise money during the progress of the work; of course the faith of the township was pledged for their payment, and in that sense, this amount was a debt.

But it was not fixed as a permanent debt, only as an obligation to secure an advance for the benefit of all the towns.

King v. Reed.

The credit of each town was loaned for the common benefit, until the debt of each could be fixed finally, and the final assessment did so fix it. It then first became a finality.

The result to which I have arrived is, that the assessments upon the lots of Mrs. McLane, Mrs. James G. King, Mrs. James G. King, Jr., and A. Gracie King must be set aside, and the remaining assessments affirmed.